CONRAD WHITFIELD AND NIGEL ANTONIO LITTLE
*v.* STATE OF MARYLAND

[No, 793, September Term, 1978.]

*Decided April 11, 1979.*

108

The cause was submitted on briefs to GILBERT, C. J., and MOORE and WILNER.

Submitted by *Arnold M. Zerwitz* and *Michael S. Elder* for appellants.

Submitted by *Stephen H. Sachs, Attorney General, Stephen Rosenbaum, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Harvey Greenberg, Assistant State's Attorney for Baltimore City,* for appellee.

GILBERT, C. J., delivered the opinion of the Court.

A cadet guard at the Baltimore City Jail surreptitiously carried a handgun into the jail and delivered it to an inmate who intended to use the weapon to effect an escape. The plot was revealed before the escape occurred. As a result, the appellants, Conrad Whitfield (Whitfield), Nigel Little (Little), and Peteta Davis (Davis) [1] were indicted by the Grand Jury for Baltimore City and charged with conspiracy to violate the Maryland statute proscribing escape from jail. Md. Ann. Code art. 27, § 139(a).[2] Whitfield, a then jail inmate, and Little, a

---

1. Ms. Davis is not a party to this appeal.
2. That section of the criminal code has been recently much attacked on the ground that it is unconstitutional. The Court of Appeals and this Court

then cadet guard, were also charged with a handgun violation, Md. Ann. Code art. 27, § 36B(b). Little was additionally charged with delivering "one .25 caliber automatic pistol" to Whitfield. All three accused pleaded not guilty to the indictments, and the case proceeded to a trial by jury on March 29, 1977. On the second day of trial, Judge David Ross declared a mistrial.

Three months later, June 22, 1977, a new jury, presided over by Judge Milton Allen, was sworn and the three defendants were retried. After a protracted trial, the jury found: 1) Whitfield guilty of the conspiracy and handgun charges, 2) Little guilty of the handgun and contraband charges but not guilty of conspiracy, and 3) Davis guilty of conspiracy.

The factual scenario began in the spring of 1976. From May to July of that year, Whitfield and one Thomas Brown were involuntary residents in the Baltimore City Jail. By happenstance, each was represented, on unrelated criminal matters, by the same attorney, Marshall Stewart. On July 2, 1976, Brown was in the Southwestern District Court for a hearing on a case there pending against him. Stewart, who was representing Brown in that proceeding, was also present. Brown took Stewart aside and told him he "had some information about a pistol" in the jail, and that he wanted "to speak to somebody" about it. Stewart informed the Police Captain in charge of the District, and Brown was taken to Central Police Headquarters where he gave a written statement relative to the details of the gun's being in the jail.

Shortly thereafter, the police alerted the Warden of the jail that a pistol had been carried into the institution, and that Whitfield and Cadet Little knew where it was. Correctional Major Howard Parks, joined by Captain Calvin Young and Lieutenant William Britton, accosted Whitfield in a passageway of the jail and ordered him to accompany them to a secluded section. There, Young and Britton confronted Whitfield with the fact that they knew "that he was in

---

have, however, upheld the constitutionality of the statute. *See* Clark v. State, 284 Md. 260 (1979); State v. Rogers, 40 Md. App. 573, 392 A. 2d 1186 (1978).

possession of a weapon within the institution." No *Miranda* [3] warnings were given prior to the confrontation or subsequent interrogation. In the words of Major Parks, the objective was "to obtain the weapon and get it out of the institution."

Whitfield admitted knowledge of the pistol and was sent, unaccompanied, to retrieve it. He returned with the gun which was wrapped in a shirt. Britton then took him to Parks's office for further questioning. Whitfield was told "he could contact his attorney," but no other rights were read to him. Whitfield then used the phone, apparently to call Stewart.

Several minutes later, a Mr. Clauss, Stewart's "legal assistant," arrived. Under renewed interrogation by Lt. Britton, with Clauss present, "Whitfield laid everything out ... what was supposed to have transpired." Whitfield's statement implicated Little and Davis. Indictment and trial followed.

On appeal to this Court, Whitfield and Little pose three contentions. We shall discuss each in the order raised by the appellants, adding such additional facts as may be necessary for a better understanding of the resolution of the issue.

## I.

"The retrial of the present cases was barred by the Double Jeopardy Clause [4] as a result of prosecutorial overreaching."

Appellants argue that:

"The failure of the prosecutor in the present case to disclose to Judge Ross that Whitfield and Davis were being represented by an attorney who had worked out an arrangement for leniency for the State's chief witness [Brown] and who was also a potential witness against his clients was clearly prosecutorial overreaching under either the

---

3. Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 294 (1966).

4. The Fifth Amendment Double Jeopardy clause mandates that, "No person shall be ... subject for the same offense to be twice put in jeopardy of life or limb. . . ."

intentional misconduct or gross negligence standards." (Footnote omitted.)

An analysis of those standards leads us to the opposite conclusion.

When the case was first called to trial on March 29, 1977, before Judge Ross and a jury, Whitfield and Davis were represented by Mr. Stewart. On the second day of the trial, Whitfield made known to Judge Ross that Stewart was "still representing Mr. Brown," who was the principal prosecution witness. Whitfield said that Stewart was "trying to get . . . [Brown] off of the hook, and I feel as though . . . I am not getting fair representation by the attorney representing me."

A bench conference before Judge Ross disclosed that Stewart had, in fact, represented Brown, Whitfield, and Davis in separate matters prior to the disclosure by Brown, at Southwestern Police Station, of the gun's presence in the jail. Stewart had told Whitfield that he, Stewart, would not be representing Brown during Whitfield's current trial. Stewart admitted, however, that he had negotiated with the State for leniency for Brown in return for Brown's cooperation in the case against Whitfield, Little and Davis. The prosecutor said that he knew about Stewart's involvement with both Brown and Whitfield "for quite sometime" but had been assured by Stewart that Stewart "had had no contact with Mr. Brown since" the revelation about the gun on July 2, 1976. After hearing from all the parties, and with the express concurrence of all three defendants, Judge Ross declared a mistrial. He based his declaration on the ground that it was of "manifest necessity, under the total circumstances," to avoid forcing Whitfield to trial in view of Whitfield's feelings toward Stewart and the apparent conflict of interest.

Prior to the commencement of the second trial, a hearing was held on the defense motions to dismiss the indictments and to suppress oral and written statements made by Whitfield and Davis. The motions averred that a retrial would subject the defendants to double jeopardy because of prosecutorial misconduct in failing to disclose Stewart's conflict of interest to the court. It was also argued that the statements taken by police from Whitfield and Davis should

have been suppressed because of ineffective assistance of counsel caused by Stewart's conflict of interest.

The trial court granted the motion to suppress the statements made by Whitfield and Davis at police headquarters. All other defense motions, including the motion to suppress the oral statements made by Whitfield to Young and Britton in the City Jail, were denied.

Recently, in *Thompson v. State,* 38 Md. App. 499, 381 A. 2d 704 (1978), we discussed prosecutorial overreaching in relation to double jeopardy. We said:

> "Although the double jeopardy clause is designed to protect the defendant against multiple punishments or repeated prosecutions for the same offense, *United States v. Dinitz,* 424 U. S. 600, 96 S. Ct. 1075, 47 L.Ed.2d 267 (1976), a request by a defendant for a mistrial ordinarily removes any bar to reprosecution even though the motion was necessitated by prosecutorial or judicial error. *Lee v. United States,* 432 U. S. 23, 97 S. Ct. 2141, 53 L.Ed.2d 80 (1977); *United States v. Dinitz, supra.* This rule is not absolute and where a mistrial is the product of prosecutorial or judicial overreaching, the double jeopardy clause prevents a retrial. *Lee v. United States, supra; United States v. Jorn,* 400 U. S. 470, 91 S. Ct. 547, 27 L.Ed.2d 543 (1971). The exact boundaries of prosecutorial overreaching, necessary to bar retrial, have not been specifically delineated by the Supreme Court. Other courts which have considered the point generally hold that prosecutorial error attributable to negligence does not amount to overreaching, *People v. Baca,* Colo., 562 P. 2d 411 (1977), while intentional misconduct calculated to gain a more favorable chance for conviction or to abort a trial that is going badly prevents reprosecution. *United States v. Kessler,* 530 F. 2d 1246 (5th Cir. 1976). The appellant argues that prosecutorial overreaching is not confined to intentional misconduct but encompasses gross negligence as well. *Commonwealth v. Bolden,* 472

Pa. 602, 373 A. 2d 90 (1977). Although in *Bolden,* the Court noted that it is unclear from the decisions of the Supreme Court whether overreaching is limited to intentional misconduct or whether it extends to gross negligence on the part of the prosecutor or judge, it concluded gross negligence was encompassed in the term after an examination of the purposes underlying the double jeopardy clause. The Court stated:

'A defendant forced to request a mistrial by conduct which conspicuously fails to satisfy professional standards should not be required to bear the heavy burdens incident to reprosecution.' 373 A. 2d at 109." 38 Md. App. at 502, 381 A. 2d at 705-06.

While the precise perimeters of the term, "prosecutorial overreaching" have not, as *Thompson* points out, been drawn by the Supreme Court or the Maryland Court of Appeals, Judge Moylan shed some light on the subject in *Loveless v. State,* 39 Md. App. 563, 387 A. 2d 311 (1978),[5] when he stated:

"Except in those rare instances where the prosecution or the court has deliberately sabotaged a trial that was going badly, the available redress where an irremedial error is recognized in mid-trial is the declaration of a mistrial followed by a retrial....

. . .

The only time that a retrial is barred under double jeopardy principles is when there has been such prosecutorial or judicial overreaching as to have mounted to a deliberate and intentional sabotaging of the earlier trial." (Citations omitted.) 39 Md. App. at 565-66, 387 A. 2d at 313.

*Thompson* and *Loveless* allude to the possibility that the gross negligence standard may be encompassed within the term "prosecutorial overreaching," *Thompson v. State,* 38

5. Certiorari denied October 20, 1978.

Md. App. at 504, 381 A. 2d at 706, *Loveless v. State,* 39 Md. App. at 569, 387 A. 2d at 315, but we did not so hold. It was unnecessary for us to decide that question because the facts were insufficient to create an issue of gross negligence.

The bar against double jeopardy does not prevent a retrial where the prosecution's commission or omission, absent an intent to cause a mistrial, amounts, at most, to the exercise of poor judgment. *Loveless v. State, supra; Thompson v. State, supra; Commonwealth v. Bolden,* 472 Pa. 602, 373 A. 2d 90 (1977). While the facts before us indicate poor judgment on the part of the prosecution, we discern no intentional misconduct or gross negligence.

Appellants place heavy reliance upon the Code of Professional Responsibility as the standard by which to measure the Assistant State's Attorney's conduct in the matter *sub judice.* They refer us to DR 1-103,[6] DR 5-102,[7] and DR 5-105.[8] Violations of the disciplinary rules, however, are not necessarily tantamount to gross negligence or intentional misconduct.

From the facts in this case, we cannot infer intentional misconduct on the part of the prosecution. He admitted to the court that he had been aware of the representation by Mr. Stewart of Brown, Whitfield and Davis, but said he had discussed the possible conflict with both defense attorneys, Stewart and the counsel for Little, prior to the aborted first trial. The prosecutor stated that based on those discussions, he did not feel there would be a dispute of fact requiring Mr. Stewart's testimony. Therefore, the Assistant State's Attorney saw no need to inform the court of Stewart's representation of possible conflicting interests. There was no indication by Whitfield prior to, or during, the first day of the short-circuited first trial that he was dissatisfied with Stewart's services.

---

6. DR 1-103 requires a lawyer to report violations of disciplinary rules to the appropriate tribunal.

7. DR 5-102 prohibits the representation of a client where the lawyer is a potential witness in the same case.

8. DR 5-105 prohibits representation of multiple clients with conflicting interests.

Whitfield became alarmed after he had observed Stewart associating with Brown and Brown's family during recesses in the trial proceedings. Whitfield knew from the outset of the case of Stewart's relationship with Brown, but he had apparently decided to proceed with the *status quo*. Moreover, it is clear from the record that after the initial incident concerning a gun being in the jail on July 2, 1976, Stewart did not act as counsel for Brown. Stewart did, however, become Whitfield's and Davis's attorney for the escape and related offenses case, with no further dealings with Brown on the matter.

The Assistant State's Attorney vigorously argued against a mistrial. That fact, while not conclusive, at least suggests that there was no intent to "sabotage" the trial in the hope of gaining a more favorable chance of conviction or abort it because it was going badly.[9]

Under the particular facts of this case, we perceive no prosecutorial overreaching in the form of gross negligence or intentional misconduct which would serve to activate the double jeopardy clause bar to the retrial of appellants.

## II.

"Evidence of other crimes was improperly admitted into evidence.

A. The State's evidence was insufficient to permit this Court to determine that evidence of other crimes was admissible under the common scheme exception.

B. The State failed to present clear and convincing evidence that the other crimes were committed and that Whitfield and Little had committed them.

C. Evidence of other crimes should have been excluded on the ground that its probative value was far outweighed by its prejudicial effect."

---

9. The State's opposition to the mistrial in the case now before us, arising in point of time as it did, negates the idea of the trial "going badly."

During its case in chief, the prosecution sought to introduce a written statement given by Brown to the police on July 3, 1976. The statement set out in detail the manner in which the defendants passed the gun into the jail via Davis, to Little, to Whitfield. According to the text of the writing, Cadet Little brought "in packages of narcotics" for Brown, Whitfield and other inmates on occasions previous to the date the gun was smuggled by Little past the other guards and into the institution.

Little's attorney objected to that part of the statement dealing with the narcotics. The prosecutor proffered that the statement was admissible under the "common scheme" exception to the rule that evidence of other unrelated crimes is inadmissible at trial of a particular crime. Judge Allen overruled the objection, saying, "I think it is a common scheme and design . . . to bring contraband into the jail. I will admit it." Thereafter, the statement was read to the jury *in toto,* and testimony was furnished by Brown concerning both the charged and uncharged "other crimes." Oddly, only Whitfield objected to the oral testimony regarding the uncharged crimes, and he was overruled on the "common scheme theory." Only Whitfield's argument as to the oral testimony was thus preserved for appeal, *Hyson v. State,* 225 Md. 140, 169 A. 2d 449 (1961). Little has no standing to raise the issue. Nevertheless, pursuant to Md. Rule 1085, we shall consider the issue with respect to both appellants because the oral testimony did not appreciably add to the written statement.

The Court of Appeals, in *Ross v. State,* 276 Md. 664, 350 A. 2d 680 (1976), supplied a definitive analysis of the evidentiary rule pertaining to the use of prior offenses or prior convictions against an accused who is on trial for different or unrelated acts. The Court said:

> "The frequently enunciated general rule in this state, followed uniformly elsewhere, is that in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of

that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible. This principle is merely an application of the policy rule prohibiting the initial introduction by the prosecution of evidence of bad character. Thus, the state may not present evidence of other criminal acts of the accused unless the evidence is 'substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character.' C. McCormick, *Evidence,* § 190 (2d ed. 1972).

. . . [A]part from the fundamental proposition that an accused may be convicted only by evidence which shows that he is guilty of the offense charged, and not by evidence which indicates his guilt of entirely unrelated crimes, there are additional reasons underlying the general rule. Evidence of other crimes may tend to confuse the jurors or prejudice their minds against the accused and to predispose them to a belief in his guilt. Finally, unless he knows in advance that evidence of other crimes is to be used against him, the accused will be unprepared to defend against such evidence.

There are exceptions to this general exclusionary rule which, perhaps, are equally well-recognized. *Thus, evidence of other crimes may be admitted when it tends to establish (1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of a crime on trial.* Additional exceptions have also been recognized: When the several offenses are so connected in point of time or circumstances that one cannot be fully shown without proving the other, and to show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial, and to prove other like crimes by the accused so

nearly identical in method as to earmark them as the handiwork of the accused." 276 Md. at 669-70, 350 A. 2d at 684. (Emphasis supplied.) (Citations omitted.)

*Accord, Cross v. State,* 282 Md. 468, 386 A. 2d 757 (1978); *McKnight v. State,* 280 Md. 604, 375 A. 2d 551 (1977); *Martin v. State,* 40 Md. App. 248, 389 A. 2d 1374 (1978). *See also Worthen v. State,* 42 Md. App. 20 (1979).

There are, as the Court stated in *Cross v. State, supra,* at 473, 386 A. 2d at 761, exceptions which "appear to swallow the rule." Judge Digges, writing for the Court, said:

"As a general rule, in order to gain the admission of evidence of other criminal acts under the common scheme or plan exception it is necessary that the crimes, including the crime charged, so relate to each other that proof of one tends to establish the other. Moreover, there must be 'not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'* 2 J. Wigmore, *Evidence* § 304, at 202 (3d ed. 1940) (emphasis in original). The concurrence of common features under this exception, however, must be more than simply a manner of operation, which is possessed to some extent by most criminal recidivists. A method of operation is not, by itself, a common scheme, but merely a repetitive pattern. Thus, evidence of other crimes can be introduced under the common scheme exception only when the relationship between the time, place, circumstances or parties involved in the crimes is such that the uncharged crime or crimes 'support the inference that there exists a single inseparable plan encompassing both the charged and uncharged crimes, typically, but not exclusively, embracing uncharged crimes committed in order to effect the primary crime for which the accused has

been indicted.[j] 312 N.E.2d at 177, 356 N.Y.S.2d at 42-43." 282 Md. at 475-76, 386 A. 2d at 762.

The prosecutor, in answer to the objections by the defense, made the following proffer:

"I submit in this case this evidence of other crimes is admissible and tends to show a common scheme, a plan which deals with a bringing into the Baltimore City Jail contraband, a weapon, in the Baltimore City Jail by a guard. I said to the jury in my opening statement, how does an inmate just go up to a guard, he doesn't just go up to a guard and say, hey, get in a gun for me. There has to be some handling of it, something that he has over the guard or some prior connection with the guard in other criminal activities which makes the guard susceptible to a part of a general scheme and the plan to make the guard be able to not submit, but make the guard subject to bringing in that contraband. I submit to the Court that the evidence will be that this guard was continuing to bring to inmates contraband other than weapons, explaining the intent of the activities of bring [sic] in pieces of contraband, a weapon, part of the same common scheme and design as bringing previous narcotics in and that's why he was able to be approached. It's an essential part of the State's case, if I can show to the jury why it is that they picked this particular guard over all the others."

To underpin their argument that the State's proffer of evidence was insufficient to allow the court to admit it under the common scheme exception, appellants rely on *Cross v. State, supra; McKnight v. State, supra;* and *Jones v. State,* 38 Md. App. 432, 381 A. 2d 317 (1978), *aff'd, State v. Jones,* 284 Md. 232 (1979). We think those cases to be inapposite.

The State's evidence, offered in *Cross* under the common scheme exception, consisted merely of a blue car having been seen in front of two residences where break-ins had occurred on a particular day. The defendant was charged with one of

the break-ins, and evidence concerning the other break-in was admitted against him. The Court of Appeals, in reversing this Court, *Cross v. State,* 36 Md. App. 502, 374 A. 2d 620 (1977), held the evidence "clearly inadequate to show any kind of systematic scheme or plan sufficient to allow admission of the evidence of the other crime." 282 Md. at 476, 386 A. 2d at 762.

McKnight was jointly tried on four charges of robbery allegedly committed within the time span of one month. The Court, in rejecting the State's argument that joinder of the four cases was justified under the "signature or handiwork" exception, declared that "such similarities as existed here 'fit into an obvious tactical pattern which would suggest itself to almost anyone disposed to commit a depredation of this sort.'" 280 Md. at 614, 375 A. 2d at 557.

Similarly, this Court, in *Jones,* reversed the conviction of a defendant who had been tried jointly upon indictments charging the commission of three armed robberies on the same day. We rejected the State's reliance upon the common scheme exception and observed, "All that we . . . [had before us was] a series of similar but unrelated robberies which do not have the common features necessary to establish a common scheme." 38 Md. App. at 439, 381 A. 2d at 322.

Our review of the record in the instant case leads us to conclude that the evidence proffered and admitted by the State was sufficient to meet the requirements of the common scheme or plan exception to the general rule. *Ross v. State, supra; Cross v. State, supra; Martin v. State, supra.* "[T]he crimes, including the crime charged, so relate to each other that proof of one tends to establish the other." *Cross v. State, supra,* 282 Md. at 475, 386 A. 2d at 762. It is apparent that Judge Allen was able to observe sufficient "relationship between the time, place, circumstances or parties involved in the crimes" so as to permit the introduction of the evidence as being part of a common scheme. *Id.* Paraphrasing the Court in *State v. Jones, supra,* the evidence adduced by the State in the case at Bar showed a "causal relation or logical or natural connection," between the furtive transporting of narcotics to inmates in the City Jail and the smuggling of the

weapon into the same institution, so as to allow a rational inference that the dealings were a "continuing transaction."

Appellants also maintain that the State failed to demonstrate by clear and convincing evidence that the "other crimes" were committed, and that Whitfield and Little committed them.

The rule is that the accused's involvement in an uncharged crime must be established by clear and convincing proof. *Cross v. State, supra,* 282 Md. at 478, 386 A. 2d at 764; *Brafman v. State,* 38 Md. App. 465, 474, 381 A. 2d 687, 691-92 (1978). The Court, in *Cross,* n. 7, opined:

> "The preferred method for submitting any evidence of other crimes to the court during trial would be by way of a proffer to the trial judge outside the presence or hearing of the jury. *Such a proffer not only protects the jury from immediate prejudice, but also allows the trial judge to determine whether there is any way to limit the prejudicial aspects of the evidence while retaining its probative character and whether the evidence should properly be introduced at that time. See United States v. Bailey,* 505 F. 2d 417, 420 (D.C. Cir. 1974), *cert. denied,* 420 U. S. 961 (1975)." 282 Md. at 478, 386 A. 2d at 764. (Emphasis supplied.)

We think the trial judge in the instant case was presented with a sufficient proffer by the State to establish a factual question regarding the common scheme involvement among Little, Whitfield and Brown. The written statement and the oral testimony tended to establish that Whitfield, Brown and Davis used Little as a conduit for the carrying of narcotics into the jail without subjecting the contraband to search and seizure by the other custodial personnel. The same method that was employed in the smuggling of the narcotics was used to secrete the weapon.

Brown testified that he was present on numerous occasions when plans were discussed between Little and Whitfield relative to carrying narcotics into the jail. That evidence established the appellants' involvement in the other crimes,

*Cross v. State, supra,* and satisfied the burden of proof shouldered by the State. *Id.*

Appellants next attack the common scheme evidence by asserting that its probative value was outweighed by its prejudicial effect.

Judge Digges, in *Cross, supra,* said:

> "In many instances, the breadth of these exceptions will present the prosecution with little difficulty in 'pigeonholing' the evidence within one of them. But it should be remembered that, though the evidence may fall within one or more of the exceptions, the trial judge still possesses discretion as to whether it should be received. In the judicious determination of this issue he should carefully weigh the necessity for and probativeness of the evidence concerning the collateral criminal act against the untoward prejudice which is likely to be the consequence of its admission. *Harris v. United States,* 366 A. 2d 461, 463-64 (D.C. 1976); *see McKnight v. State, supra* at 612-13 [556]. *See generally McCormick on Evidence, supra,* § 190, at 453-54. In some cases, this may require that evidence of the criminal actions of the defendant be totally excluded; in others, admission of portions or all of the evidence of the defendant's specific criminal actions may be permissible." 282 Md. at 474, 386 A. 2d at 761.

*See also Brafman v. State, supra,* 38 Md. App. at 474-75, 381 A. 2d at 692-93.

The problem in cases such as that now before us is one of balancing the probative value of the evidence against its prejudicial effect. The balancing process is described by McCormick in his *Handbook of the Law of Evidence* § 190 at 453 (2d Ed. 1972), where it is said:

> "[S]ome of the wiser opinions . . . recognize that the problem is . . . one of balancing, on the one side, the actual need for the other-crimes evidence in light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that

the other crimes were committed and that the accused was the actor, and the strength or weakness of the other crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility." (Footnotes omitted.)

*See Brafman v. State,* 38 Md. App. 465, 475-76, 381 A. 2d at 693 (1978).

Appellants argue that "introduction of the other crimes evidence served no legitimate need" and that "it was unnecessary for the State to prove Little's motive in order to prove its case on the crime charged." [10] *See Martin v. State, supra,* 40 Md. App. at 255, 389 A. 2d at 1377 (1978). We view the matter in a different light. As we see it, aside from Brown, there was no other known witness who could have testified as to the conversations and the machinations that took place among Little, Whitfield and Davis. Brown's testimony was absolutely crucial to the State's case on the issue of whether a conspiracy was extant to get a gun into the jail and use it to effect an escape. The prior dealings leading up to the time the weapon was smuggled into the jail were, in our view, material to the showing of the existence of a conspiracy. Brown's evidence was probative on the issue of Little's involvement as the perdu of the other two co-conspirators.[11] Although evidence of prior criminal acts by a defendant, not charged in the matter for which he is on trial, is prejudicial to a defendant, we believe that the evidence educed by the State in the case *sub judice* was properly balanced by Judge Allen, and that he correctly found that its probative value outweighed its prejudicial effect. We perceive no error.

## III.

Appellants seek to invoke *Miranda* [12] and thereby exclude

---

[10]. It was necessary for the State to show that Little changed sides. Instead of guarding the inmates, the job he was hired to do, he became an ally of Whitfield, Davis and Brown.

[11]. Little proved to be the kind of guard against whom other guards guard.

[12]. *See* n. 3, *supra.*

from the evidence Whitfield's inculpatory oral statement which was made to the correctional officers, Captain Young and Lieutenant Britton. Appellants asseverate that "[b]ecause Miranda warnings were not given, the trial court improperly admitted incriminating statements made by Whitfield during interrogations conducted by jail authorities." Appellants had raised this issue by way of a pretrial motion to suppress, but Judge Allen denied that motion. At trial, they failed to object to the testimony establishing that the incriminating statements were made by Whitfield.

The State asserts that the issue has not been preserved for our review because the record shows no objection was voiced by Whitfield when testimony concerning his retrieving the gun and his statement that "he wasn't going to see Mr. Dardeen [another jail employee] get hurt" was introduced. Inasmuch as those two answers went to the very viscera of Whitfield's oral admission, the State reasons that the admissibility *vel non* of the oral statement, as such, is not preserved. In short, the State says that the failure to object to the questions which drew the damaging response constitutes a waiver of the earlier motion to suppress. Of course, Little has no standing to raise the *Miranda* issue. The privilege against self-incrimination is highly personal and may not be vicariously utilized. *Butz v. State,* 221 Md. 68, 156 A. 2d 423 (1959). Little may not seek refuge under Whitfield's constitutional umbrella.

The difficulty with the State's position relative to Whitfield is that it seems to overlook Md. Rule 736, which provides that a motion asserting that an "omission, statement or confession" was unlawfully obtained must be raised before the trial. Md. Rules 736 a 4 and 736 b. If the hearing court denies the motion to suppress, that ruling "is reviewable on a motion for a new trial or on appeal of a conviction." Md. Rule 736 g 2. The rule became effective July 1, 1977, the day after the testimony that the State thinks constitutes a waiver. The order of the Court of Appeals adopting the new rules of criminal procedure states:

"ORDERED, that the Rules and Forms hereby

adopted by this Court shall govern the courts of this State and all parties and their counsel in all actions and proceedings; and shall take effect and apply to all proceedings commenced on and after July 1, 1977, and insofar as practicable, to all proceedings then pending. . . ."

There is, we believe, no practical reason for not applying Rule 736 to the instant case. Therefore, we hold that the issue of the applicability *vel non* of *Miranda* has been properly preserved. Md. Rule 736 g 2.

*Miranda* proscribes custodial interrogations unless specified warnings are first furnished to an accused and then knowingly and intelligently waived by him. It is undisputed that the questioning of Whitfield in the City Jail by Captain Young and Lieutenant Britton was not preceded by *Miranda* admonitions, nor, apparently, was *Miranda* even mentioned.

The record is clear that when the two guards stopped Whitfield, led him to a secured area, and demanded that he surrender the gun, he at first denied knowledge of it, but shortly thereafter went to the place where he had hidden the pistol and then carried it to Young and Britton. Whitfield was then taken to Major Parks's office for further questioning. Once there, Britton informed Whitfield that Whitfield could contact an attorney. No other warnings were given. Whitfield requested counsel, and the interrogation was halted. By coincidence, Mr. Clauss [13] was in the City Jail visiting another prisoner. Clauss consulted with Whitfield. Thereafter Whitfield "laid everything out." Whitfield contends "that inasmuch as his statements flowed from questioning initiated by Young and Britton after they accosted him and took him to a secluded part of the jail, the custodial interrogation requirement of *Miranda* is met and the oral statement made by him were [*sic*] inadmissible at his trial."

Unequivocally, knowledge by prison or jail officials of a gun's being in the hands of an inmate creates an emergency with which they must cope immediately. The situation

---

13. The record is unclear as to Clauss' status except that he worked for Marshall Stewart. He was described as an investigator and as an associate.

demands prompt and drastic action. The gun's presence in the penal institution is a "bell ringer" that an escape attempt is imminent, with the strong possibility that one or more homicides may occur. It behooves the officials to move with alacrity to locate the weapon and confiscate it in order to protect their own lives, the lives of the prison populace, visitors who might be in the institution at the time, and the public generally.

Without question, an inmate's possession of a gun is a breach of prison discipline. In that connection, this Court, speaking through then Chief Judge Murphy, stated in *Hunt v. State,* 2 Md. App. 443, 447, 234 A. 2d 785, 787-88 (1967):

> "Inmates must of necessity surrender some of their constitutional rights so that proper prison administration and discipline may prevail. In *Stewart v. State,* 1 Md. App. 309, 316, [229 A. 2d 727, 731 (1967)], and *Smith v. State,* 1 Md. App. 297, 301, [229 A. 2d 723, 725 (1967)], we held that searches of inmates by prison authorities were reasonably necessary in the fulfillment of the custodian's administrative duties. Similarly, interrogation by prison officials with relation to the maintenance of internal security and discipline and to the rules and regulations of the prison, where the thrust and purpose of the interrogation does not relate to a prosecution for any crime, does not fall within the ambit of the *Miranda* decision." (Footnote omitted.)

Appellants rely on *Mathis v. U. S.,* 391 U. S. 1, 88 S. Ct. 1503, 20 L.Ed.2d 381 (1968), and its siblings. *See, e.g., U. S. v. Redfield,* 402 F. 2d 454 (4th Cir. 1968); *State v. Harris,* 576 P. 2d 257 (Mont. 1978); *State v. Davis,* 67 N. J. 222, 337 A. 2d 33 (1974). In *Mathis,* the defendant was interrogated by a tax investigator while Mathis was serving a prison sentence for an unrelated offense. Statements made by Mathis, without benefit of *Miranda* warnings, were subsequently admitted against him in a criminal prosecution for filing false tax refund claims. The Supreme Court held that even though the interrogation was not conducted in furtherance of criminal proceedings, such investigations frequently lead to criminal

charges and that possibility, itself, was sufficient to warrant that *Miranda* warnings be given. *Cf., State v. Davis, supra,* (interrogation by a parole officer). The United States Court of Appeals for the Fourth Circuit reversed a conviction of a prison inmate on marijuana charges because statements used by the prosecution at trial against the defendant were elicited from the defendant by a warden at a disciplinary hearing without the *Miranda* warnings having been given. The Court held that *Mathis* precluded the use of statements obtained by prison officials without *Miranda* warnings even where the intent is nonprosecutorial at the time of questioning. *United States v. Redfield, supra.*

The *Mathis* reasoning has been followed in other cases. *Baxter v. Palmigiano,* 425 U. S. 308, 96 S. Ct. 1551, 47 L.Ed.2d 810 (1976); *Sands v. Wainwright,* 357 F. Supp. 1062, 1093, n. 76 (M.D. Fla. 1973), *vacated on other grounds,* 491 F. 2d 417 (5th Cir. 1973); *State v. Harris, supra. See generally Biddy v. State,* 127 Ga. App. 212, 193 S.E.2d 31 (1972); Annot., 31 A.L.R.3d 565, 666 (1970). The State, however, argues that such cases are "all factually inapposite in that they involve either post-emergency disciplinary hearings or investigations which do not deal with possible imminent breaches of prison security."

*Hunt v. State, supra,* upon which the State relies, is the sole Maryland case to ever address the issue, although a number of other jurisdictions have had the occasion to speak on the subject. *People v. Sanchez,* 65 Cal. 2d 814, 423 P. 2d 800 (1967) (statements admissible due to apprehension of safety for prison by guard); *State v. Archible,* 25 N. C. App. 95, 212 S.E.2d 44 (1975) (interrogation of prison guard held non-custodial); *State v. Abbott,* 21 Utah 2d 307, 445 P. 2d 142 (1968) (interrogation immediately after stabbing to find owner of knife); *State v. Persinger,* 72 Wash. 2d 561, 433 P. 2d 867 (1967), *cert. denied,* 393 U. S. 864 (1968) (statement taken during course of escape); *State v. LaRue,* 19 Wash. App. 841, 578 P. 2d 66 (1978) (on-the-scene investigation for weapon).

We agree with the State that the above-cited cases more aptly apply to the circumstances surrounding the incriminating statements made by Whitfield, than do those

which journey to an opposite end. The questioning of Whitfield was not an interrogation, looking toward prosecution, but an on-the-scene investigation for a deadly weapon which presented a threat to the security of the jail. *State v. LaRue, supra.* Moreover, a fair reading of the record discloses that the correctional officers were preoccupied more so with the recovery of the gun, whether there were other guns inside the jail, and the details of the escape attempt, than with the apprehension and punishment of Whitfield.

Appellants aver that *Mathis,* decided after *Hunt,* "severely eroded" *Hunt's* dicta as "precedental value." We disagree. *Mathis* and its progeny were concerned with totally different circumstances, a factual dissimilarity which distinguishes the *Mathis-Redfield* rationale from the case *sub judice.* The value of the dicta in *Hunt* as a guiding light for cases of this genre has not been extinguished, nor has its illumination been dimmed.

We hold that where, as here, correctional officers of a penal institution are informed of the existence of a weapon cached within the institution's confines and, consequently, presenting the possibility of an imminent breach of security or a volatile situation, a questioning of a person reasonably likely to have knowledge of the weapon's whereabouts so as to aid the officials in removing the weapon from the institution, or which questioning is designed to secure the safety of the prison population, is permissible. Incriminating statements made by any party involved in the immediate scope of the investigation may, within the sound discretion of the trial judge, be admitted in evidence even though the declarant was not afforded proper *Miranda* warnings before questioning.

We are not to be understood as sanctioning a *carte blanc, sans Miranda* interrogation by correctional officials of prison inmates. Prisoners do not surrender all of their constitutional rights when they enter a penal institution. *Miranda* is normally applicable to them as well as to the general populace. Only the most unusual explosive circumstances will excuse *Miranda* compliance.

Judge Allen thoughtfully summed up the situation that

confronted Major Parks, Captain Young and Lieutenant Britton when he said:

> "[A] prison is a different type of facility than anything [else] we have in this country. . . . [There] different rules are followed, different regulations for control, different anxieties arise and reactions to those are different. . . . [W]hereas it might have been wise in the courthouse, for instance, to rush in with a squad of policemen to find . . . [the] gun that had gotten into the courthouse, I find the actions of the officers at the Baltimore City Jail wise and commendable in the course that they took, . . . as quietly as possible, without exciting the other prisoners, or without letting it be known what was going on, to secure the dangerous situation [in which] they found themselves. . . . . . . [T]hey went about it by quietly talking to Mr. Whitfield, letting him know they knew he had a gun or that he had access to a gun, directed him to go get it rather than charge through the halls with him to get it, recovering the gun and then questioning Mr. Whitfield with reference to — of the details of the alleged prison break or the planned prison break. . . . I think it would be stretching it a great deal if we required prison officials acting in a very dire emergency to accord to prisoners under their care the right guaranteed by the Miranda case."

We agree.

*Judgments affirmed; costs to be paid*
*by appellants.*