[Crim. No. 13729.    Second Dist., Div. Four.    Aug. 28, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES HENRY WOODBERRY, Defendant and Appellant.

Richard S. Buckley, Public Defender, Edward B. Olsen, Gerald McC. Franklin and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Phillip G. Samovar, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—Appellant Woodberry, together with his codefendants Kenney and Magee, were charged with murder (Pen. Code, § 187). Their joint trial commenced with the selection of a jury on August 23, 1966. On August 25 the charge against Magee was dismissed on motion of the People and the trial proceeded against the other two. On August 31, before the People's case had been completed, all parties waived a jury and agreed to complete the trial before the court sitting without a jury. On September 26 the court found appellant guilty of murder in the first degree. The record on appeal does not show the disposition as to Kenney.

This is Woodberry's appeal from the judgment.[1]

The issues to be discussed here involve the admissibility of (1) Woodberry's confession, and (2) the evidence received to impeach Magee.

### The Confession Problem

At about 3 a.m. on July 2, 1965, Park's Texaco Service

---

[1]Counsel has followed the archaic practice of stating that he appeals also from the order denying a new trial. This multiplies the work of the clerk, who must record the disposition of another ineffectual attempt to appeal, and the overhead of the attorneys who must purchase the digests and annotations where the rulings on these purported appeals are faithfully collected. An order denying a new trial has not been appealable after judgment since Penal Code section 1237 was amended in 1961.

Station at Lewis Street and Pacific Coast Highway in Long Beach was robbed and the attendant on duty, William E. Sommerville, was fatally wounded by a pistol shot. Before expiring, Sommerville told a police officer that the robbers were " 'two male Negroes,' " that " 'the tall one took the money' " and the " 'short one' " shot him. Sommerville gave some description of the two men.

The crime received a great deal of publicity and a reward was offered for information. During the ensuing nine months the Long Beach police received tips concerning some 150 suspects, but investigation failed to turn up the guilty parties. In March 1966 a prisoner in one of the sheriff's jail facilities sent word that he had information about this crime. On March 30 or 31 Long Beach Officer Vogel went to the facility and interviewed the informant. The informant stated in substance that at the time of the robbery he was in the vicinity of the Texaco station; he heard a shot and observed a man who looked like Woodberry, with whom he was acquainted. On subsequent occasions the informant saw Woodberry and discussed the robbery with him, and Woodberry admitted having done the shooting. This was the first information the police had connecting Woodberry with the crime.

On the morning of April 7, 1966, Officer Vogel visited Woodberry at the state prison at Vacaville where he was confined as a result of a recent conviction for another Long Beach robbery. The meeting took place in an interview room within the institution. There was an intercommunication system whereby a person in the room could talk with a correctional officer who was stationed elsewhere. The correctional officer advised both Vogel and Woodberry they could use the intercom any time either wished to call him. After Vogel and Woodberry had been by themselves for a time, Vogel called the correctional officer and asked for a stenographer to take a statement. The correctional officer ordered Woodberry not to answer any more questions and sent him away.

Vogel had brought a tape recorder with him, but he did not use it because prison officials had forbidden him to do so.

The only evidence of what was said when Vogel and Woodberry were alone together is Vogel's testimony and the written report he made after leaving the prison.

On the morning of April 7 he started his conversation with Woodberry by saying "I'm here to talk to you about a robbery and a murder that took place at the Parks Texaco Serv-

ice Station in Long Beach. . . ." He then advised Woodberry that he had a right to an attorney and a right to remain silent, and that anything he said could be used against him in court. Woodberry responded that he understood.

In the course of the conversation Woodberry told all about the robbery-murder. He said that he had shot the attendant, that Kenney was with him, and that Magee had driven them to the locality in a car and waited to drive them away. It was after the confession had been completed that Vogel had called the correctional officer to ask for a stenographer.

The confession was obtained prior to the decision of the United States Supreme Court in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], which came down June 13, 1966, but the trial occurred after the *Miranda* decision. Therefore the rules set forth in *Miranda* govern the admissibility of the confession in this case. (*Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

At the trial, the People contended that the confession was admissible because at the time it was given the case was in a purely investigatory stage. It was argued (a) that Woodberry was not in the custody of Officer Vogel, and that his confinement in a state prison for an unrelated offense should not be regarded as "custody" within the *Miranda* rule; and (b) that Vogel had no grounds to arrest Woodberry as of that time, his only information having come from an unreliable source; hence suspicion had not "focused" upon Woodberry.

The trial court admitted the confession over the objections of appellant's attorney.

Before Woodberry confessed he was not advised, in conformity with the *Miranda* rules, that if he could not afford an attorney one would be appointed for him prior to any questioning if he desired. (See 384 U.S. at p. 479 [16 L.Ed.2d at p. 726].) Thus if the confession was taken under the circumstances which are covered by the *Miranda* rules, it is inadmissible.

During the pendency of this appeal, on May 6, 1968, the United States Supreme Court handed down its decision in *Mathis* v. *United States,* 391 U.S. 1 [20 L.Ed.2d 381, 88 S.Ct. 1503]. In that case the defendant had been convicted of a federal tax fraud. Part of the evidence included a statement made by the defendant to a federal agent while the defendant was in jail serving a state sentence. The Supreme Court held

that Mathis had been in "custody" within the meaning of the *Miranda* decision, and hence his statements were inadmissible.

The Attorney General now concedes that under the *Mathis* decision, the custody argument relied upon by the prosecution in the trial is no longer tenable. But the Attorney General still contends that the *Miranda* warnings were unnecessary in this case because there was no interrogation, and because suspicion had not focused on Woodberry at the time.

Both aspects of that contention are based upon the language used in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Under that line of decisions, an extrajudicial statement was inadmissible when "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (62 Cal.2d at pp. 353-354.) Following those decisions, certain kinds of questioning of a suspect for the purpose of giving him a chance to explain incriminating circumstances were said not to be "a process of interrogations that lent itself to eliciting incriminating statements." (See, e.g., *People* v. *Stewart* (1965) 62 Cal.2d 571, 578 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Cotter* (1965) 63 Cal.2d 386, 396 [46 Cal.Rptr. 622, 405 P.2d 862], judgment vacated on other grounds (1967) 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035], appeal dismissed by consent June 14, 1967; *People* v. *Sanchez* (1967) 65 Cal.2d 814, 824 [56 Cal.Rptr. 648, 423 P.2d 800], decision vacated November 21, 1967.)

The kind of distinction which the Attorney General seeks to draw must fail when the reasoning of the *Mathis* and *Miranda* decisions is applied to the facts of this case. In *Mathis* it was contended that the questions asked were a part of a routine tax investigation where no criminal proceedings might be brought. The Supreme Court pointed out that there was always the possibility that the investigation would result in criminal prosecution, and concluded: "We reject the contention that tax investigations are immune from the *Miranda* requirements for warnings to be given a person in custody." (20 L.Ed.2d at p. 385.) It is noteworthy that the Supreme

Court apparently accepted the government's statement that at the time Mathis' statements were made, the case was no more than "a routine tax investigation."

The *Miranda* decision does not readopt the four-point test of *Escobedo* and *Dorado*. The *Miranda* standard is stated in different language. Early in the *Miranda* opinion appears this language: "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4]

"[4]This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." (384 U.S. at p. 444 [16 L.Ed.2d at p. 706].)

It is unnecessary here to ponder the meaning of footnote 4 as an interpretation of the *Escobedo* rules. The language quoted above from the body of the opinion permits only one result when applied to the facts of the instant case. Woodberry was in custody. Officer Vogel came to talk with him to find out whether he was the person who had committed the robbery-murder which Vogel was investigating. The interview was conducted in conventional question-and-answer form. This was custodial interrogation, in the ordinary meaning of the English language, and in the meaning intended by the United States Supreme Court.

The *Miranda* opinion reflects the view of a majority of that court that specific procedural safeguards are necessary to prevent a violation of the constitutional rights of a person who is in custody. The opinion declares: "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, . . ." (384 U.S. at p. 478 [16 L.Ed.2d at p. 726].)

At that point the opinion summarizes the procedural requirements without which no evidence obtained as a result of interrogation can be used.

Under *Miranda* and *Mathis,* Woodberry's confession is not

admissible. (See also *People* v. *McFall* (1968) 259 Cal.App. 2d 172, 176 [66 Cal.Rptr. 277].) The rules which are binding upon this court compel a reversal. (*People* v. *Powell* (1967) 67 Cal.2d 32, 54-55 [59 Cal.Rptr. 317, 429 P.2d 137].)

### The Magee Impeachment

Counsel have briefed and submitted this additional point which must be determined for the guidance of the court upon retrial.

It appears that on April 7, 1966, just a week after Woodberry confessed, Officer Vogel went to the Deuel Vocational Institute, where Magee was then confined, and obtained a full confession from him. This confession was preceded by the warnings required by the *Escobedo-Dorado* rules, but was not in conformity with the *Miranda* rules, which had not yet been pronounced. In this confession Magee described in detail the planning of the crime, his participation in driving Woodberry and Kenney to and from the scene, and Woodberry's statement afterwards that he had shot a man.

Although the record on appeal is not explicit on this, it appears that the trial court must have ruled the Magee confession inadmissible in an off-record conference, and this ruling influenced the decision of the prosecution to dismiss Magee.

The district attorney announced that he was moving for a dismissal of Magee on the grounds of "insufficient admissible evidence" and "also on the grounds of Penal Code Section 1099."[2]

Even though that dismissal was itself a bar to further prosecution (Pen. Code, § 1101) a formal order granting immunity was made pursuant to Penal Code section 1324. Magee was then called as a witness on behalf of the People. Upon questioning by the deputy district attorney Magee testified in substance as follows: He was not in the vicinity of Pacific Coast Highway and Lewis Street at about 3 a.m. on July 2, 1965; Magee and the defendants Woodberry and Kenney were at the home of a friend in Watts from 8 p.m., July 1, until 2 a.m., July 2, at which time they and others left Watts by automobile and drove to Bakersfield. Woodberry was in the same car as Magee, while Kenney was in one of the

---

[2]Penal Code section 1099: "When two or more defendants are included in the same accusatory pleading, the court may, at any time before the defendants have gone into their defense, on the application of the prosecuting attorney, direct any defendant to be discharged, that he may be a witness for the people."

accompanying vehicles. Magee further testified that prior to April 7, 1966, he had never heard of any crime that had occurred at the Parks Service Station at Pacific Coast Highway and Lewis.

The prosecutor then showed Magee a transcript of his confession and asked him if that gave him any different recollection. Magee refused to answer, despite an order by the court that he must answer or be subject to fine and imprisonment.

The prosecution claimed surprise at the testimony which had been given, and the court granted leave to offer impeaching testimony. Thereupon the prosecutor read each question and answer from the transcript of the April 7 confession, and asked the witness, with respect to each, whether he had been asked that question and had made that answer. The witness consistently refused to answer.

Before questions were asked about the April 7 statement the trial court gave the jury this instruction: ''Evidence that on some former occasion a witness other than the defendant made a statement or statements that are contradictory of his testimony here may be considered by you only for the purpose of testing the credibility of the witness and not for the purpose of proving the truth of the statement.''

Following the direct examination of Magee, both defendants were offered the opportunity to cross-examine Magee, and both refused to do so.

The next witness called was Officer Vogel, who testified directly to what had been said in his April 7, 1966, interview with Magee.

All of this evidence was received over objections by defendants' attorneys, upon the grounds, among others, that the Magee confession was a violation of the *Miranda* rules, and that the admission of it was a violation of the defendants' rights to confrontation under the Sixth Amendment to the federal Constitution.

With respect to the first ground, *People* v. *Varnum* (1967) 66 Cal.2d 808 [59 Cal.Rptr. 108, 427 P.2d 772] is in point. There the Supreme Court held that a defendant has no standing to object to evidence obtained through the interrogation of another person without a *Miranda* warning. The privilege against self-crimination does not include a privilege against incriminating someone else.

With respect to the right of confrontation, defendant relies upon *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074]. In that case Loyd and Douglas

were charged with the same offense. Loyd, who had confessed, was tried first and convicted. At the trial of Douglas, Loyd was called as a prosecution witness but refused to answer any questions. The prosecutor then read his confession to him, including a portion which inculpated Douglas, and asked Loyd if he had made that statement. Loyd persisted in his refusal to answer. Then law enforcement officers testified that the document embodied a confession made by Loyd.

The Supreme Court reversed Douglas' conviction upon the ground that this procedure violated Douglas' right to confrontation.[3]

The court said: "Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true." (380 U.S. at p. 419 [13 L.Ed.2d at pp. 937-938].)

There is an important distinction between *Douglas* v. *Alabama* and the case at bench. Loyd did not answer any questions, and there was no occasion to impeach him. The extrajudicial statement was offered "Under the guise of cross-examination to refresh Loyd's recollection." Of course this was a sham. For the purpose of refreshing the witness' recollection it was unnecessary to disclose the contents of the document to the jury.

In the case at bench Magee gave testimony which, if true, completely exculpated both of the defendants who were on trial. Under the rules of evidence it was proper to attack his credibility; and his prior inconsistent statement was admissible for that purpose. (Evid. Code, §§ 780, 1235.)

The recent decision in *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111] must also be considered. In that case the defendant's wife and daughter testified before the grand jury, relating facts sufficient to prove guilt. At the trial both witnesses recanted. The grand jury testimony was then received in evidence and the jury was instructed, pursuant to Evidence Code section 1235, that the prior testimony had the same effect as testimony given in

---

[3]United States Constitution, Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; . . ."

court. Without the grand jury transcript, there was no substantial evidence of guilt. The Supreme Court reversed upon the ground that the Evidence Code section was an unconstitutional deprivation of the right to confrontation insofar as it made extrajudicial statements of a witness admissible for the truth of the matters asserted.

The *Johnson* decision does not reach the issue raised here, for the opinion does not discuss the use of prior inconsistent statements for the purpose of impeachment. Historically such statements have been admitted for that purpose without any constitutional challenge. But there is language in both *Johnson* and *Douglas* which is so broad that, if read literally, would prohibit the use by the People of a prior inconsistent statement for impeachment in a criminal case.

In *Douglas* the opinion states (at p. 420 [13 L.Ed.2d at p. 938]) : "Hence, effective confrontation of Loyd was possible only if Loyd affirmed the statement as his." Read out of context, this would preclude introducing a prior statement for impeachment unless the witness admitted having made it. But the *Douglas* case does not involve impeachment.

In *Johnson* the California court seems to equate the right of confrontation with *immediate* cross-examination. (Italics in the *Johnson* opinion.) But this does not mean that no hearsay declaration could be received for any purpose in a criminal case over defendant's objection. *Johnson* must be read in the light of the problem there presented: the new and unprecedented rule of section 1235 which made the prior statement substantive evidence.

Under the Evidence Code, upon retrial, the People will be entitled to call Magee as a witness; and, if he gives testimony contrary to what he said on April 7, 1966, impeach him without proof of surprise. (Evid. Code, §§ 780, subd. (h), 785.)

The judgment is reversed. The purported appeal from the order denying a motion for a new trial is dismissed.

Jefferson, J., and Kingsley, J., concurred.