CONRAD WHITFIELD AND NIGEL ANTONIO LITTLE
*v.* STATE OF MARYLAND

[No. 54, September Term, 1979.]

*Decided February 15, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ██ORTH, COLE and DAVIDSON, JJ.

*Thomas J. Saunders, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* on the brief, for appellant.

*Stephen Rosenbaum, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH, J., concur in part and dissent in part. MURPHY, C. J., filed an opinion concurring in part and dissenting in part at page 144 *infra,* in which SMITH, J., concurs.

We granted certiorari in this case to address what has been described as "probably the most difficult and frequently raised question in the wake of *Miranda* — what constitutes the 'in custody interrogation' or 'custodial questioning' which must be preceded by the *Miranda* warnings." [1] Specifically, we are asked to decide: (1) whether, in the absence of *Miranda* admonitions, statements elicited from the petitioner, a prison inmate, during interrogations conducted by jail officials, in the circumstances present here, could properly be admitted into evidence in a criminal prosecution of the inmate? and (2) whether a belief by prison officials that a gun was hidden within the jail, creates an emergency which excuses a failure to give *Miranda* warnings and permits the use of statements obtained from the questioned inmate in a criminal prosecution against him? Because we conclude that the inquiry occurred in the type of custodial setting condemned by the Supreme

---

1. Kamisar, " 'Custodial Interrogation' within the meaning of Miranda," in *Criminal Law and the Constitution: Sources and Commentaries* 335 (1968). The reference to *Miranda* is to the Supreme Court decision of Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

Court in *Miranda,* and since we can find no exception to its requirements in emergencies such as the one that existed here, we vacate petitioner's conviction and grant him a new trial.

## I

The events which give rise to this appeal took place in the early part of July 1976. At that time, Nigel Little,[2] a cadet guard at the Baltimore City jail, surreptitiously delivered a handgun to petitioner Conrad Whitfield, who apparently intended to use the weapon to escape from the prison. The petitioner's plans were thwarted, however, when Thomas Brown, a fellow resident at the jail, revealed to his attorney, Marshall Stewart, Esquire, that he had information concerning the presence of a pistol in the Baltimore City jail and wished to speak with someone about it. The attorney, who incidentally also represented Whitfield on unrelated criminal matters, told the authorities about this conversation, and the police relayed the information to the warden of the jail.

Upon learning of the gun's presence within the jail walls and that Whitfield was somehow connected with it,[3] correctional officers Major Howard Parks, Captain Calvin Young and Lieutenant William Britton set out "to locate Mr. Whitfield [, who apparently was permitted to move unescorted around portions of the jail,] and confront him with the information." Shortly after beginning their search, the three officers located the petitioner as he was alighting from a prison elevator with some fellow inmates. Without explanation, Whitfield was directed to accompany Officers Young and Britton to the isolation wing of the jail. Once inside the secluded confines of this area, which at the time was unoccupied by others, the officers immediately confronted

2. While Little is listed as an appellant in this case, his conviction below is not before us. At oral argument, we were informed by the Public Defender that although Whitfield and Little had jointly petitioned this Court for review, our grant of certiorari restricted to the *Miranda* issue, in effect, dismissed Little as a party to the appeal because only Whitfield was claiming a violation of those rights.

3. It is unclear from the record just how the Baltimore City jail officials learned of the petitioner's involvement, since both Brown and Stewart testified that they had not mentioned Whitfield's name to the authorities.

petitioner with the fact that they knew "that he was in possession of a weapon within the institution." Captain Young testified that no *Miranda* warnings were given to Whitfield prior to or during his interrogation. The captain justified this failure by stating that his "immediate objective" was "[t]o obtain the weapon and get it out of the institution"; consequently, the witness explained that he approached Whitfield in the following manner: "as if you emphatically know that they are guilty of a said situation . . . [so that] the shock of your presenting it to them immediately will get a positive response." When asked about the gun, Whitfield at first denied having any knowledge concerning it. Britton and Young persevered with "that line of questioning for a few minutes," but petitioner continued to insist that he did not know what they were talking about. Finally, Lt. Britton

> told [Whitfield] that Cadet Little and some police officers from the Baltimore City Police Department were in the Deputy Warden's office and knew everything about the handgun being in the institution and it would be best for all concerned if he would turn the gun in and prevent anybody from getting hurt.[4]

Whitfield responded to that statement by admitting knowledge of the weapon and told the officers "that he would have to retrieve the gun from a given area of the institution, and that he would have to go by himself to retrieve [it]." Permission was granted Whitfield to fetch the gun, and upon returning five to ten minutes later to the isolation wing he handed the weapon to Britton and Young.

With the pistol safely in hand, Lt. Britton escorted the petitioner to Major Park's office for further questioning. There, the lieutenant offered Whitfield a cup of coffee, and, even though the full *Miranda* warnings were again not given to him, petitioner was informed that "he could contact his

---

4. While not raised by the petitioner, we note that the promise contained in Lt. Britton's statement may raise questions of voluntariness under nonconstitutional Maryland criminal law as recently discussed in Hillard v. State, 286 Md. 145, 150-54, 406 A.2d 416, 418-20 (1979).

attorney." The prisoner used the phone and apparently attempted to call Mr. Stewart, but was informed that at the time the attorney was not in his office. However, almost immediately after completing the phone call, and prior to any additional questioning, a Mr. Claus, Mr. Stewart's office assistant, arrived at Major Park's office. In Mr. Claus's presence, the officer questioned petitioner concerning both the already recovered gun and the alleged escape plan. During the ensuing five to ten minutes, Whitfield verbally "laid everything out, . . . what was supposed to have transpired." Subsequently he was indicted for a handgun violation, Md. Code (1957, 1976 Repl. Vol.), Art. 27, § 36B (b), and for conspiracy to escape, *id.* at § 139 (a).

A pretrial hearing was held in the Criminal Court of Baltimore where, among other things, petitioner moved to suppress both oral statements made because of the failure of the jail authorities to comply with the dictates of *Miranda.* The court (Allen, J.) did not determine whether the statements sought to be suppressed were improperly elicited during a "custodial interrogation" within the meaning of *Miranda,* for in its view, "it would be stretching it a great deal if we required prison officials acting in a very dire emergency to accord to prisoners under their care the rights guaranteed by the Miranda case." When subsequently he was convicted of the handgun and conspiracy charges, Whitfield appealed this ruling to the Court of Special Appeals. That court affirmed the trial court's decision because it agreed that the emergency facing the prison officials here excused compliance with *Miranda's* dictates. *Whitfield v. State,* 42 Md. App. 107, 125-28, 400 A.2d 772, 783-85 (1979). In an attempt to accommodate its decision to the confines of *Miranda,* the court reasoned that:

> The questioning of Whitfield *was not an interrogation, looking toward prosecution, but an on-the-scene investigation for a deadly weapon* which presented a threat to the security of the jail. . . . [A] fair reading of the record discloses that the correctional officers were preoccupied more so with the recovery of the gun, whether there were

other guns inside the jail, and the details of the escape attempt, than with the apprehension and punishment of Whitfield. [*Id.* at 128, 400 A.2d at 784 (citation omitted) (emphasis added).]

We disagree.

## II

In *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held:

[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him. [*Id.* at 478-79.]

These principles stemmed from the Supreme Court's basic concern that the "compulsion inherent in custodial surroundings" may endanger an individual's fifth

amendment right to be free from compelled self-incrimination. *Id.* at 457-58. *See Beckwith v. United States,* 425 U.S. 341, 345-46, 48 L. Ed. 2d 1, 96 S. Ct. 1612 (1976); *Mills v. State,* 278 Md. 262, 267, 363 A.2d 491, 494 (1976); *Myers v. State,* 3 Md. App. 534, 537, 240 A.2d 288, 291 (1968). See also Smith, *The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?,* 25 S. Car. L. Rev. 699, 700 (1974). While the warnings designed to overcome that danger are only "prophylactic rules" rather than constitutional dictates, *Michigan v. Tucker,* 417 U.S. 433, 439, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974), the purpose underlying these rules should nevertheless be kept in mind when applying *Miranda* to any given set of circumstances. In this regard, we observe that statements which are obtained from a defendant during questioning conducted without the benefit of *Miranda* warnings, as concededly occurred here, need only be excluded from evidence if they "flow from a 'custodial interrogation' within the meaning of *Miranda.*" *Vines v. State,* 285 Md. 369, 374, 402 A.2d 900, 903 (1979). Such interrogation is defined by the Supreme Court as any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona, supra,* 384 U.S. at 444 (footnote omitted). This has been held by that Court to include "questioning which takes place in a prison setting during a suspect's term of imprisonment on a separate offense, *Mathis v. United States,* 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968), and to questioning taking place in a suspect's home, after he had been arrested and is no longer free to go where he pleases, *Orozco v. Texas,* 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095 (1969)." *Oregon v. Mathiason,* 429 U.S. 492, 494-95, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977) *(per curiam).*

In contrast to custodial inquiry is "the traditional function of police officers in investigating crime ... [to conduct] [g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process," which does not require the use of the *Miranda* safeguards. *Miranda v. Arizona, supra,* 384 U.S. at

477. An on-the-scene investigation is normally envisioned as encompassing a general exploration into suspicious circumstances in order to determine if a crime has been committed; or as encompassing a probe into known crime which lacks an identifiable suspect. *See, e.g., United States v. Wiggins,* 509 F.2d 454, 459-60 (D.C. Cir. 1975); *United States v. Sadler,* 458 F.2d 906, 908 (10th Cir. 1972); *State v. Frizzell,* 207 Kan. 393, 485 P.2d 160, 163-64 (1971); Lederer, *Miranda v. Arizona — The Law Today,* 78 Mil. L. Rev. 107, 135-36 (1978). *See generally* Annot., *What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring that Suspect be Informed of His Federal Constitutional Rights Before Custodial Interrogation,* 31 A.L.R.3d 565 § 3 (1970 & 1979 Supp.) (citing cases). As is often the case, the parties here have characterized the questioning of Whitfield as falling within one or the other of these mutually exclusive categories. Thus, our primary task today is to determine whether the questioning of petitioner by officers Britton and Young was a "custodial interrogation." However, prior to addressing this issue, we need to consider the State's contention that *Miranda* is inapplicable to emergencies such as existed at the time of the questioning in the Baltimore City jail, for if this is so, then it will be unnecessary for us to delineate the type of interrogation that then occurred.

Relying on dicta in *Hunt v. State,* 2 Md. App. 443, 447, 234 A.2d 785, 787-88 (1967), as well as a handful of decisions from other jurisdictions, *People v. Sanchez,* 65 Cal. 2d 814, 423 P.2d 800, 56 Cal. Rptr. 648 (1967); *State v. Archible,* 25 N.C. App. 95, 212 S.E.2d 44 (1975); *State v. Abbott,* 21 Utah 2d 307, 445 P.2d 142 (1968); *State v. Persinger,* 72 Wash. 2d 561, 433 P.2d 867 (1967), *cert. denied,* 393 U.S. 864 (1968); *State v. LaRue,* 19 Wash. App. 841, 578 P.2d 66 (1978), the Court of Special Appeals, in upholding the trial court's ruling, determined that compliance with *Miranda* by prison authorities is excused by the emergency erupting from the "unusual explosive circumstances" of a gun in the possession of an inmate. *Whitfield v. State, supra,* 42 Md. App. at 126-28, 400 A.2d at 783-85. We find, however, that we cannot agree with this

reasoning because to do so would allow the exigency needs of institutional security, although at the time permissible in resolving the emergency, to be later used so as to deprive a person of his constitutional rights in the course of providing a fair trial when that emergency no longer existed.

We begin our discussion of why we reach this conclusion by noting that the United States Supreme Court itself has not placed any per se limitation on where and when the *Miranda* safeguards should be applied. In fact, they specifically expressed just the opposite position when explaining the need for such protections:

> Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons *in all settings* in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. [*Miranda v. Arizona, supra,* 384 U.S. at 467 (emphasis added).]

Nor do we find the cases relied on by the intermediate appellate court persuasive in resolving the issue we now confront. While these decisions do contain broad dicta to the effect that a threat to the security of a prison justifies non-compliance with *Miranda* and the subsequent use of any statements obtained in prosecuting their author, these holdings were based on the fact that the inmate-defendants in the situations present in those cases were not "in custody" or had not been "interrogated." [5] *See People v. Sanchez,*

---

5. Our research uncovered only one jurisdiction — California — which has adopted a true emergency exception to *Miranda.* In that state, the intermediate appellate court, in decisions rendered post-*Miranda,* relying on the pre-*Miranda* ruling of the California Supreme Court in People v. Modesto, 62 Cal. 2d 436, 398 P.2d 753, 42 Cal. Rptr. 417 (1965), held that, in cases involving kidnapping, the concern of law enforcement agents in finding a kidnapping victim outweighs the fifth amendment rights of the kidnapper. *See* People v. Riddle, 83 Cal. App. 3d 563, 148 Cal. Rptr. 170, 176-78 (Ct. App. 1978), *cert. denied,* 440 U.S. 937 (1979); People v. Dean, 39 Cal. App. 3d 875, 114 Cal. Rptr. 555, 559-60 (Ct. App. 1974). As the court in *Dean* put it:

[E]ven more basic than the right of a citizen not to be compelled to incriminate himself is the right of a citizen to his *life.* . . .
. . . While life hangs in the balance, there is no room to require

*supra,* 423 P.2d at 806 (pre-*Miranda* decision; guard called to scene of stabbing and asked crowd of inmates "who did this and why" — held not "in custody" and no process of interrogation had yet been undertaken); *State v. Archible, supra,* 212 S.E.2d at 46 (questioning of guard; noncustodial inquiry into suspected criminal activity; freedom of movement not restricted since defendant was allowed to leave place of questioning); *State v. Persinger, supra,* 433 P.2d at 868 (defendant found on roof of prison asked why he didn't follow other escaping inmate, purely "conversational inquiry," product of "spontaneous, human curiosity"); *State v. LaRue, supra,* 578 P.2d at 69 (questioning not during accusatory stage). Additionally, these cases, as did *Hunt v. State, supra,* turned to a degree on an inappropriate interpretation of *Miranda* — that whether interrogation is proscribed under *Miranda* depends on the reason why the questions were asked — one rejected by the Supreme Court in a later case. *See Mathis v. United States,* 391 U.S. 1, 4, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968). For a fuller discussion, see Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When Does it Matter?,* 67 Geo. L.J. 1, 9 (1978).

While it has often been stated that "as a general matter, lawful detention or imprisonment 'necessarily makes unavailable [to an inmate] many rights and privileges of the ordinary citizen,'" *Thomas v. State,* 285 Md. 458, 463, 404 A.2d 257, 260 (1979) (quoting from *Wolff v. McDonnell,* 418 U.S. 539, 555, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974)), the only

admonitions concerning the right to counsel and to remain silent. . . . While we do not countenance the rubber hose to obtain the answers, we see no wrong in asking the type of questions found herein.

The easy answer is to decide that the police are under a duty to ask questions concerning the location of the victim but that none of the defendant's answers may be used against him in a court of law. This would seem to protect both the victim and the accused. What about the "fruit of the poisonous tree" doctrine? Its application could well free the accused and basic justice would be wanting.

While a premium must be placed on rescue of the victim, this must not occur in a setting that will merely turn the criminal loose again to work his evil upon others. The kidnapper must be stopped and the victim saved. [*Id.* at 559-60.]

constitutional rights of an inmate which this Court, or the United States Supreme Court, has held to "be diminished by the needs and exigencies of the institutional environment" are those protected by either the first or fourth amendments. *See, e.g., Thomas v. State, supra,* 285 Md. at 463, 468, 404 A.2d at 260, 263 (prison security justified warrantless search); *Bell v. Wolfish,* 441 U.S. 520, 545-47, 550-59, 60 L. Ed. 2d 447, 472-74, 476-81, 99 S. Ct. 1861, 1877-78, 1880-84 (1979) (restrictions on incoming publications reasonable under 1st amendment; searches of inmate living quarters reasonable under 4th amendment); *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 129-32, 53 L. Ed. 2d 629, 97 S. Ct. 2532 (1977) (1st amendment not violated by restrictions on prisoner solicitations).[6] The limitations as to these rights of prisoners are based on the longstanding legal and historical interpretation of such guarantees: the first amendment right of free speech is subject to *reasonable* time, place and manner restrictions, *e.g., Bell v. Wolfish, supra,* 441 U.S. at 552; *Grayned v. City of Rockford,* 408 U.S. 104, 115-16, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972); and the protection of the fourth amendment results only when a person can claim a *reasonable* expectation of privacy that has been invaded by the government, *e.g., Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 226, 99 S. Ct. 2577 (1979); *Thomas v. State, supra.* Limitations similar to these have never been imposed on the fifth and sixth amendment rights of citizens. Moreover, in the past, the Supreme Court has drawn distinctions between the fourth amendment rights of individuals and the guarantees contained in the fifth and sixth amendments, holding that the former may be more easily waived than the latter because

> [t]here is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment .... The protections of the Fourth Amendment are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth

---

6. The procedural due process rights of prisoners have also been restricted. *See* Wolff v. McDonnell, 418 U.S. 539, 561-62, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974).

at a criminal trial. [*Schneckloth v. Bustamonte,* 412 U.S. 218, 241-42, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973).]

Thus, the fifth amendment guarantee against compulsory self-incrimination, being different in nature from other constitutionally established individual liberties, should not, in our opinion, be diminished by the needs of penal administration to the extent that such statements may be utilized in a criminal prosecution.

At the suppression hearing in the trial court in this case, the State asserted that its position was not that the exigencies of prison life justified the extraction of incriminating information from inmates; rather, it urged that the appropriate test to be employed in determining if it may be used in the criminal prosecution was whether the statement had been voluntarily made, and not whether there was technical adherence to the warning requirements of *Miranda.* This argument, however, ignores one of the chief underpinnings of the Supreme Court's rationale for requiring the warnings — statements made during an in-custody interrogation are inherently untrustworthy and "[u]nless adequate protective devices are employed to dispel the compulsion . . ., no statement obtained from the defendant can truly be the product of his free choice." *Miranda v. Arizona, supra,* 384 U.S. at 457-58. *See State v. Kidd,* 281 Md. 32, 36, 375 A.2d 1105, 1108, *cert. denied,* 434 U.S. 1002 (1977) ("*Miranda* impressed procedural safeguards on the traditional test of voluntariness").

Finally, the State attempts to justify an extension of the balance struck in *Thomas v. State, supra,* to interrogations by contending that if it was required to inform an inmate, such as Whitfield in the circumstances here, that he had a right to remain silent and consult with an attorney, then their ability to adequately maintain the safety and security of the jail would be greatly hampered. While there is probably some validity to the State's assertion that in some situations they would not receive the necessary information, we find it is unpersuasive. Implicit in their argument is the assumption that criminal prosecution of an inmate, following the end of

the emergency, is also imperative to maintain prison security. While we recognize that prison security may be enhanced through prosecution of those who attempt to penetrate it, this objective cannot be allowed to destroy the constitutional protections designed to ensure a fair trial. If the State feels that the emergency before it requires the use of the psychological techniques of persuasion employed here in order to obtain immediate information, then it may do so, but at the cost of foregoing the affirmative use of this information at a subsequent criminal trial. While this result to some may seem harsh, we believe it is necessary if we are to protect the fifth amendment rights of prisoners. Moreover, the choice which confronts the State here is no different from that which it makes when granting immunity — letting one individual go unprosecuted in order to obtain evidence to prosecute another individual or to accomplish some other societal benefit. This analysis is similar to that followed by many of our sister states in attempting to accommodate the constitutional rights of prisoners and the law enforcement interests of the state when the facts of a case constitute both a violation of prison rules and a crime, *i.e.,* permitting the State to discipline the inmate and also criminally prosecute him, while fully protecting his right to defend himself at the disciplinary hearing and yet maintain his fifth amendment right against self-incrimination. *See, e.g., Avant v. Clifford,* 67 N.J. 496, 341 A.2d 629 (1975) (excellent discussion of the many court decisions around the country, as well as the issues involved in cases of this type). *See generally* Turner and Daniel, *Miranda in Prison: The Dilemma of Prison Discipline and Intramural Crime,* 21 Buffalo L. Rev. 759 (1972). Thus, we hold that *Miranda* applies to prison inmates to the same extent that it does to all other citizens. Having reached this conclusion, we now turn to the question of whether Whitfield was subjected to custodial interrogation within the meaning of that Supreme Court decision.

## III

A determination of whether custodial questioning has occurred requires, in the first instance, a finding that the

defendant was in "custody," as that term is defined in the *Miranda* opinion. This is by far the most litigated aspect of *Miranda,* and an issue on which the Supreme Court has provided little guidance. *Compare Oregon v. Mathiason, supra,* 429 U.S. at 494-95 (parolee questioned at police station not in custody because he was free to leave) *and Beckwith v. United States, supra,* 425 U.S. at 347 (suspect in tax fraud investigation questioned at a private home where he occasionally stayed was not in custody) *with Orozco v. Texas,* 394 U.S. 324, 327, 22 L. Ed. 2d 311, 89 S. Ct. 1095 (1969) (suspect questioned in his bedroom was under arrest, not free to leave, and thus in custody) *and Mathis v. United States, supra,* 391 U.S. at 4-5 (suspect questioned about tax fraud while imprisoned on another charge was in custody). Petitioner contends, however, that one of these decisions — *Mathis, supra* — is dispositive on the issue of his custody within the meaning of *Miranda,* but, as we view Whitfield's situation, it is unnecessary to so characterize the *Mathis* holding.

In *Mathis,* the defendant was questioned by an agent of the Internal Revenue Service while he was in state prison serving a sentence on an unrelated matter, and his statements, made without receiving the *Miranda* warnings, were subsequently admitted against him in a criminal tax prosecution. In reversing the conviction, the Supreme Court held that (1) "custody" under *Miranda* was not dependent on the reason why the person questioned was in custody, and (2) the warnings are required to be given even if the interrogation that was conducted lacks prosecutorial intent at the time. *Id.* at 4-5. Petitioner argues that a fair reading of *Mathis* requires a reversal of his conviction because, in his view, it stands for the proposition that being incarcerated, in and of itself, is sufficient restraint to require the *Miranda* warnings whenever any questions are asked of an inmate. Later decisions by the Supreme Court seem to support this interpretation, for when they discuss *Mathis* and the custody concept, the Court states that it "squarely grounded its holding on the custodial aspects of the situation," *i.e.,* being in prison. *Beckwith v. United States, supra,* 425 U.S. at 347.

*See Oregon v. Mathiason, supra,* 429 U.S. at 494. While a few courts have been willing to interpret *Mathis* in this broad fashion — that prison confinement equals custody — *see United States v. Redfield,* 402 F.2d 454, 455 (4th Cir. 1968) (*per curiam*); *Blyden v. Hogan,* 320 F. Supp. 513, 519 (S.D.N.Y. 1970); *People v. Woodberry,* 265 Cal. App. 2d 351, 71 Cal. Rptr. 165, 168 (Dist. Ct. App. 1968); *People v. Faulkner,* 90 Mich. App. 520, 282 N.W.2d 377, 379 (1979); *State v. LaRue,* 19 Wash. App. 841, 578 P.2d 66, 69 (1978); *see generally Inmates of Attica Correctional Facility v. Rockefeller,* 404 U.S. 809, 30 L. Ed. 2d 40, 92 S. Ct. 35 (1971) (Douglas dissent from denial of temporary restraining order); Lederer, *Miranda v. Arizona — The Law Today,* 78 Mil. L. Rev. 107, 129 n. 82 (1978); Smith, *supra,* 25 S. Car. L.Rev. at 725-28, we find that is is unnecessary to do so here since under the general test to be utilized in deciding when one is in "custody," which we announce today, it is clear that Whitfield was "deprived of his freedom of action" in the *Miranda* sense at the time of questioning, without regard to the fact that he was otherwise incarcerated when it occurred.

Deciding when a person has been significantly deprived of his freedom of action so as to be in custody within the meaning of *Miranda* depends on the factual setting surrounding the interrogation in each case. This issue has frequently been confronted by the courts of this country, and a variety of tests have been developed as an aid for making that decision. *See, e.g., United States v. Gibson,* 392 F.2d 373, 376 (4th Cir. 1968) (subjective intent of interrogating officer to arrest suspect); *Windsor v. United States,* 389 F.2d 530, 534 (5th Cir. 1968) (degree of focus); *State v. Intogna,* 101 Ariz. 275, 419 P.2d 59, 65 (1966) (subjective belief of suspect); *Reeves v. State,* 258 Ark. 788, 528 S.W.2d 924, 926-27 (1975) (objective); *People v. P (Anonymous),* 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255, 260 (1967) (reasonable belief); *see generally* Lederer, *supra,* 78 Mil. L. Rev. at 130-33. The majority of courts which have explicitly addressed this question, however, have adopted an objective reasonable person approach to determining custody. *See, e.g., Borodine v. Douzanis,* 592 F.2d 1202, 1206 (1st Cir. 1979); *United States*

v. Luther, 521 F.2d 408, 410 (9th Cir. 1975) (per curiam); Iverson v. State of North Dakota, 480 F.2d 414, 422 (8th Cir.), cert. denied, 414 U.S. 1044 (1973); United States v. Hall, 421 F.2d 540, 545 (2d Cir. 1969); Hunter -v. State, 590 P.2d 888, 894-95 (Alaska 1979); State v. Mumbaugh, 107 Ariz. 589, 491 P.2d 443, 448 (1971) (en banc); People v. Arnold, 66 Cal. 2d 438, 58 Cal. Rptr. 115, 426 P.2d 515, 521 (1967); People v. Parada, 533 P.2d 1121, 1123 (Colo. 1975) (en banc); State v. Lewis, 373 A.2d 603, 607 (Me. 1977); Beason v. State, 453 P.2d 283, 286 (Okla. Cr. 1969); State v. Paz, 31 Or. App. 851, 572 P.2d 1036, 1040 (1977) (en banc); Commonwealth of Pennsylvania v. Fisher, 466 Pa. 216, 352 A.2d 26, 28 (1976); State v. Hohman, 136 Vt. 341, 392 A.2d 935, 940 (1978). See also Annot., What Constitutes "Custodial Interrogation" within Rule of Miranda v. Arizona Requiring that Suspect be Informed of his Federal Constitutional Rights Before Custodial Interrogation, 31 A.L.R.3d 565 (1970 & 1979 Supp.), where most, if not all cases on this question are catalogued; 1 B. George, Criminal Procedure Sourcebook 361 (1976); Smith, supra, 25 S. Car. L. Rev. at 711-13. Under this test:

> [C]ustody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority. * * * [T]he custody requirement of Miranda does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. * * * [Myers v. State, 3 Md. App. 534, 537, 240 A.2d 288, 290 (1968).]

The general inquiry to be made, as expressed in a frequently quoted opinion by the Second Circuit, is whether

> in the absence of actual arrest something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their

questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so. [*United States v. Hall, supra,* 421 F.2d at 545.]

Thus, some actual indication of custody must exist, such that a reasonable person would feel he was not free to leave and break off police questioning. *See Cervantes v. Walker,* 589 F.2d 424, 428 (9th Cir. 1978). In making this factual evaluation, a court should look to

those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning — whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation — whether the defendant left freely, was detained or arrested — may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning. [*Hunter v. State, supra,* 590 P.2d at 895 (footnote omitted).]

*See, e.g., Cervantes v. Walker, supra,* 589 F.2d at 427-28 (factors include "the language used to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and pressure exerted to detain him").

Turning now specifically to the case at hand, we find that the circumstances surrounding the questioning of Whitfield at both interrogations lead to the conclusion that they were conducted while he was in "*Miranda* custody." At the

interrogation in the isolation wing, where he confirmed the existence of the gun, the following concededly took place: Whitfield, as the prime suspect, was the only inmate questioned; the guards separated him from his fellow inmates and directed that he accompany them; he was taken to the isolation wing of the jail to be alone with his interrogators; the testimony of the officers was that the petitioner was immediately confronted with knowledge of his guilt in order to "shock" the necessary information out of him; when their first line of questioning did not reveal the gun's whereabouts, the officers switched tactics and informed petitioner of the evidence amassed against him so as to demonstrate the futility of his position; and while Whitfield was permitted to leave the interrogation scene at its conclusion (a key factor mentioned by the Supreme Court in *Oregon v. Mathiason, supra*) he was only given his freedom in order to retrieve the weapon, and once he had done that, he was again deprived of his freedom of movement. By the time the second interrogation took place in Major Park's office, Whitfield was clearly in custody and was being questioned simply to obtain additional information concerning the presence of the weapon within the prison walls. Thus, we believe it apparent that during both sets of questioning Whitfield was in "*Miranda* custody."

Once such custody is established, a court must still determine whether an "interrogation" took place before a violation of *Miranda* exists. "Interrogation," like "custody," is not easily defined, although in its usual sense, it "refers to police questioning designed to elicit a response from a suspect." Lederer, *supra,* 78 Mil. L. Rev. at 134. Of course, not all questioning by law enforcement officials of one in custody is tantamount to an interrogation in the *Miranda* sense. *See Vines v. State,* 285 Md. 369, 375-76, 402 A.2d 900, 903-04 (1979). For example, in a recent opinion by Judge Orth, this Court noted: "There seems to be general agreement . . . that *Miranda* does not apply to 'administrative questioning,' the routine questions asked of all arrestees who are 'booked' or otherwise processed." *Id.* at 376, 402 A.2d at 904. However, except for this type of questioning, if custody is found to

exist, then any examination likely to lead to incriminating statements will be a *"Miranda* interrogation."

The State responds to this assertion by urging that even if there was custody under *Miranda,* there existed in both questionings no *Miranda* interrogation of Whitfield because the officers' primary concern when they examined the petitioner was to secure the prison area by locating the gun, and not an attempt to elicit statements for criminal prosecution. While we have no doubt that the principal purpose of the guards, at least at first, in conducting these interrogations was to locate and remove the weapon and any others that may have been involved from the institution, we do not believe that the subjective intent, albeit the primary objective, of the examiner should control the determination of when interrogation within the meaning of *Miranda* has occurred. The Supreme Court has rejected a similar argument to that made here by the State in *Mathis v. United States, supra.* Consequently, it seems to us, in the words of Professor Kamisar

> that so long as the police conduct is likely to elicit incriminating statements and thus endanger the privilege, it is police "interrogation" *regardless of its primary purpose or motivation,* and that if it otherwise qualifies as "interrogation," *it does not become something else* because the interrogator's main purpose is [something other] than the procuring of incriminating statements, even though self-incrimination may be foreseen as a windfall. [Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When does it Matter?,* 67 Geo. L.J. 1, 9 (1978) (footnote omitted) (emphasis in original).]

*Accord, Proctor v. United States,* 404 F.2d 819, 820-21 (D.C. Cir. 1968). It follows from what we have just said that the mere fact that Officers Britton and Young did not intend to elicit incriminating information from Whitfield for prosecutorial purposes does not mean that they did not interrogate him in the *Miranda* sense.

Finally, the State maintains that this questioning was part of a general on-the-scene investigation rather than a custodial interrogation. This argument also fails. As we indicated earlier in this opinion, the concepts of on-the-scene questioning and custody are mutually exclusive; if custody exists, as it does on the facts here, then an on-the-scene investigation cannot be said to have occurred. Such a scene investigation involves a general fact-finding mission, without significantly interfering with the right of movement of the person or persons to whom the questions are directed. *See, e.g., Lowe v. United States,* 407 F.2d 1391, 1394-96 (9th Cir. 1969). In this case, the jail authorities had established the need for police action and their attention had been focused on Whitfield as the one who most likely was criminally responsible. Thus, the inquiry here, from its inception, was not an on-the-scene factual investigation, but a custodial interrogation requiring that the *Miranda* warnings be given.

We conclude, therefore, that, since the *Miranda* warnings should have preceded any interrogation by the jail officials, all statements made by Whitfield prior to these warnings were improperly admitted at his trial, and a new one is required.

> *Judgment of the Court of Special Appeals reversed and case remanded to it with direction to reverse the judgment of the Criminal Court of Baltimore and. remand the case to that court for a new trial.*
>
> *Pursuant to Maryland Rule 882 f, costs are not reallocated as part of the judgment of this Court.*

*Murphy, C. J., concurring in part and dissenting in part:*

The Court holds that the jail officials' initial confrontation with Whitfield, *i.e.,* when they first accosted him as he emerged from the jail elevator and brought him to the isolation room in an effort to ascertain the whereabouts of

the gun, constituted a "custodial interrogation" within the contemplation of *Miranda;* and that absent *Miranda* warnings Whitfield's first oral admission that he had knowledge of the weapon, and his subsequent act in retrieving the gun and turning it over to the authorities, was inadmissible in evidence. I do not agree with that conclusion and, therefore, dissent from that part of the majority holding which would exclude this evidence from being introduced upon retrial of the case.

*Mathis v. United States,* 391 U.S. 1, 88 S. Ct. 1503, 20 L. Ed. 2d 381 (1968), makes clear that the principles of *Miranda* apply to a custodial interrogation conducted in a prison and that it makes no difference that the interrogators are correctional officials, rather than police officers. I agree that Whitfield's initial oral statement admitting knowledge of the weapon was made while he was in "custody" in a *Miranda* sense, *i.e.,* he was deprived or restricted of his normal freedom of action or movement within the jail under pressure of official authority. I do not agree, however that the oral statement made at that initial confrontation was responsive to an "interrogation" within the contemplation of *Miranda* since the inquiry was not made to elicit evidence of a crime but rather as part of an investigation limited in purpose to the location of a weapon which presented a real threat to the internal security of the prison. An individual may be in custody, but not subjected to an "interrogation" in the *Miranda* sense, as the majority recognizes. Nothing in *Mathis* or in *Miranda* itself supports the majority's position that *any* custodial examination that has the potential to lead to an incriminating statement is a *Miranda*-type interrogation; nor does either of those cases equate an "interrogation" with an inquiry of an inmate concerning suspected breaches of internal prison security, and this is so even though the suspected breach may also, if established, constitute evidence of a crime. In effect, the Court has extended *Miranda* to foreclose an inquiry concerning the maintenance of internal prison security unless the inmate is first given the full panoply of *Miranda* warnings, including the admonition that he may refuse to talk to prison authorities about the matter

and may have a lawyer present with him if any such inquiry is actually conducted.

The majority seemingly recognizes that the concern of the jail authorities in the intitial confrontation with Whitfield was to obtain knowledge of the gun's location in order to secure the safety of the jail, rather than to elicit admissions for use at a criminal prosecution. In this regard, it should be noted that there was no questioning of Whitfield at that time concerning his alleged escape plan; rather the inquiry was limited and singular in purpose — to locate the gun and thus to reestablish prison security and discipline. In these circumstances, it makes no sense to conclude, as the majority does, that no inquiry may be made of a prisoner without prior *Miranda* warnings if there is a possibility that evidence relevant to a criminal prosecution may result. The majority's conclusion that the State may make the inquiry without giving *Miranda* warnings but must forego use of that relevant evidence is both an unwarranted extension of *Miranda's* holding and a needless price to exact in order to maintain internal prison security and discipline.

The cases supporting the proposition that inquiry of the type and for the singular purpose initially conducted in this case does not constitute "interrogation" within the meaning of *Miranda,* upon which the Court of Special Appeals relied in its opinion below — but which the majority finds unpersuasive — make good sense to me and are not at variance with the fundamental import of the *Miranda* decision. Representative of these cases is *State v. LaRue,* 19 Wash. App. 841, 578 P.2d 66 (1978). In that case, LaRue, a prison inmate, was questioned by a correctional officer in a segregation cell immediately following the stabbing of another inmate with a knife. *Miranda* warnings were not given. LaRue was asked as to the location of the knife and he gave an incriminating answer. The guard testified that his purpose in questioning LaRue was to locate the weapon and secure the prison, rather than to investigate the stabbing. The court held that *Miranda* warnings need not be given in these circumstances because the primary purpose of the inquiry was to find and remove a dangerous weapon from the prison

and not to pursue a criminal investigation, *i.e.,* there was no "interrogation" in the *Miranda* sense. Similarly, as the Court of Special Appeals said in *Hunt v. State,* 2 Md. App. 443, 447, 234 A.2d 785 (1967), "interrogation by prison officials with relation to the maintenance of internal security and discipline and to the rules and regulations of the prison, where the thrust and purpose of the interrogation does not relate to the prosecution for any crime, does not fall within the ambit of the *Miranda* decision."

Closely allied with the line of cases represented by *LaRue* and *Hunt* are those which hold that *Miranda* does not foreclose recognition of a limited exception to its rules of custodial interrogation in order to meet emergencies seriously affecting the safety of human life where the intent in making the inquiry and taking the statement is nonprosecutorial at the time. See *e.g. United States v. Castellana,* 500 F.2d 325 (5th Cir. 1975); *People v. Riddle,* 83 Cal. App. 3d 563, 148 Cal. Rptr. 170 (1978), *cert. denied,* 440 U.S. 937, 99 S. Ct. 1283, 59 L. Ed. 2d 496 (1979); *People v. Dean,* 38 Cal. App. 3d 875, 114 Cal. Rptr. 555 (1974). The lives and safety of many individuals within a prison are placed in serious jeopardy by the presence of a gun within the institution particularly where, as here, the gun is thought to be associated with an escape plan.[1] As Chief Judge Gilbert so cogently observed for the intermediate appellate court in this case (*Whitfield v. State,* 42 Md. App. at 125-126, 128):

> "Unequivocally, knowledge by prison or jail officials of a gun's being in the hands of an inmate creates an emergency with which they must cope immediately. The situation demands prompt and drastic action. The gun's presence in the penal institution is a 'bell ringer' that an escape attempt is imminent, with the strong possibility that one or more homicides may occur. It behooves the officials

---

1. In this case, testimony revealed that the pistol was an integral part in an escape plan which was scheduled for Sunday, July 5, only a short time after the prison authorities located the gun. The plan was to "get the drop" on a guard armed with a shot gun down by the gate on the ground level. Once the inmates had his gun, they intended to "make their way" out of the gate and over a small wall.

to move with alacrity to locate the weapon and confiscate it in order to protect their own lives, the lives of the prison populace, visitors who might be in the institution at the time, and the public generally."

\* \* \*

". . . The questioning of Whitfield was not an interrogation, looking toward prosecution, but an on-the-scene investigation for a deadly weapon which presented a threat to the security of the jail. *State v. LaRue, supra.* Moreover, a fair reading of the record discloses that the correctional officers were preoccupied more so with the recovery of the gun, whether there were other guns inside the jail, and the details of the escape attempt, than with the apprehension and punishment of Whitfield."

\* \* \*

"We hold that where, as here, correctional officers of a penal institution are informed of the existence of a weapon cached within the institution's confines and, consequently, presenting the possibility of an imminent breach of security or a volatile situation, a questioning of a person reasonably likely to have knowledge of the weapon's whereabouts so as to aid the officials in removing the weapon from the institution, or which questioning is designed to secure the safety of the prison population, is permissible. Incriminating statements made by any party involved in the immediate scope of the investigation may, within the sound discretion of the trial judge, be admitted in evidence even though the declarant was not afforded proper *Miranda* warnings before questioning.

"We are not to be understood as sanctioning a *carte blanc, sans Miranda* interrogation by correctional officials of prison inmates. Prisoners do not surrender all of their constitutional rights when

they enter a penal institution. *Miranda* is normally applicable to them as well as to the general populace. Only the most unusual explosive circumstances will excuse *Miranda* compliance."

To hold that *Miranda* precepts were violated at Whitfield's first custodial confrontation with jail officials, and that the incriminatory evidence that flowed from that session was inadmissible in evidence, is to lose sight of overriding institutional needs and objectives, and unnecessarily, and unwisely, to weaken the control of prison officials over the maintenance of prison security and discipline. See *Baxter v. Palmigiano,* 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976), declining to hold that the strictures of *Miranda* were applicable in non-criminal prison disciplinary proceedings. I do, however, fully agree with the Court that the second confrontation between Whitfield and the jail authorities, *i.e.,* that which occurred after the gun had been retrieved and prison security reestablished, constituted a custodial interrogation squarely within the contemplation of *Miranda* and that oral statements obtained at that time from Whitfield were not properly admissible in evidence, since the *Miranda* warnings admittedly were not given to him prior to the interrogation.

Judge Smith authorizes me to say that he concurs in the views here expressed.